**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 15, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

D.A. OSGUTHORPE FAMILY
PARTNERSHIP, a Utah limited
partnership,

      Plaintiff-Appellant,

v.

ASC UTAH, INC., a Maine corporation;
WOLF MOUNTAIN RESORTS, L.C., a
Utah limited liability company; the
THIRD JUDICIAL DISTRICT COURT,
an agency of the Judicial Branch of
government of the State of Utah; and THE
HONORABLE ROBERT K. HILDER, in
his capacity as a Judge of the Third
Judicial District Court in and for the State
of Utah,

      Defendants-Appellees.

Nos. 11-4062, 11-4113, and 11-4159

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH – SALT LAKE CITY**
**(D.C. No. 2:11-CV-00147-DS)**

---

David Scofield, Peters/Scofield, Salt Lake City, Utah, for Plaintiff-Appellant.

Brent M. Johnson, Utah State Administrative Office of Courts, for Defendants-Appellees
Third Judicial District Court and Judge Robert K. Hilder, Salt Lake City, Utah, and John
R. Lund, Snow, Christensen & Martineau, Salt Lake City, Utah, for Defendant-Appellee
ASC Utah (Kara L. Pettit, Snow, Christensen & Martineau, Salt Lake City, Utah,
Attorney for Defendants-Appellees ASC Utah, with them on the brief).

Before **LUCERO**, **HOLLOWAY**, and **HARTZ**, Circuit Judges.

---

**HOLLOWAY**, Circuit Judge.

---

## INTRODUCTORY STATEMENT

Some time ago, this lawsuit began in Utah state court. Since then, the litigation has not so much developed as it has metastasized: parties have proliferated, claims have collided, and issues have become intimately entangled. Eventually, one of the frustrated suitors looked to the federal courts for relief, asking for a stay of all state-court proceedings and an order compelling arbitration of the state-court claims. The federal district court declined to do so, dismissed the case, and awarded attorney's fees to the prevailing party.

This appeal asks whether the federal district court correctly determined that, simply put, the federal court should stay out of the still-unfolding state-court controversy.[1] We conclude that the Supreme Court's *Colorado River* doctrine, *see Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817-21 (1976), is the persuasive and controlling law in this case. We think that in this case the *Colorado River* doctrine wisely counsels our abstention from duplicative interference

---

[1] There are three separate appeals at issue in this case. These appeals—Nos. 11-4062, 11-4113, and 11-4159—were consolidated for purposes of briefing and oral argument. No. 11-4062 came to us on interlocutory appeal from the district court's order denying the appellant's "Motion for Order Compelling Arbitration and to Stay, for a Temporary Restraining Order and Preliminary Injunction and for Expedited Resolution." No. 11-4113 is a direct appeal from the district court's dismissal of the case. Finally, No. 11-4159 pertains to the district court's award of attorney's fees. All issues raised in these separate appeals will be comprehensively resolved by us in our decision today.

with the exceptionally protracted state proceedings present here. We AFFIRM the district court's dismissal and DISMISS AS MOOT the interlocutory appeal of the district court's order denying the motion to compel arbitration and for a stay of the state-court proceedings. In addition, we must VACATE the district court's award of attorney's fees and REMAND the matter to the district court for detailed findings of fact sufficient to afford meaningful appellate review of its award.

## BACKGROUND

*A. Factual Setting*

Summit County, Utah is a place of rugged, mountainous beauty. As such, it is ripe for development for tourism and recreational pursuits. This is not without its problems. In the early 1990s, Wolf Mountain Resorts, L.C. began acquiring land around Park City, Utah with the aim of creating an all-season, "world class" resort destination.[2] App. at 196. In 1996, Wolf Mountain leased about 560 acres of Summit County property from the D.A. Osguthorpe Family Partnership, which owns ranchlands in Summit County.[3] The parties contemplated that the Osguthorpe parcel would be used as part of the ski resort. The planned use would involve "the installation, maintenance and operation of two ski lifts, snow making, and clearing of ski trails and such other related facilities,

---

[2]     Although a named party on appeal, Wolf Mountain did not participate in the briefing or oral argument of this case.

[3]     We note that the nature of the property interest granted by Osguthorpe has been the subject of some dispute in the Utah state courts, both in this litigation and elsewhere. *See,* e.g.*, Smith* ex rel. *Estate of Smith v. Osguthorpe*, 58 P.3d 854 (Utah Ct. App. 2002). The exact classification of that interest is not relevant to the case now before us.

structures and roads as may be required." *Id.* at 245.

Wolf Mountain also enlisted ASC Utah, Inc. to help in realizing its vision. In 1997, Wolf Mountain leased its property interest in the resort to ASC Utah under a 200-year "Ground Lease." In effect, ASC Utah would undertake the development and operation of the planned resort, which was to include a ski area, golf course, condominiums, and assorted tourist accommodations. In 1998, the lease agreement between Wolf Mountain and Osguthorpe was also amended to allow ASC Utah to conduct ski-resort operations on the Osguthorpe lands.

The following year, ASC Utah, Wolf Mountain, Osguthorpe, and Summit County (along with numerous other parties not involved in this case) memorialized their development plans in a document entitled "Amended and Restated Development Agreement for the Canyons Specially Planned Area, Snyderville Basin, Summit County, Utah." The Development Agreement called for the construction of an eighteen-hole golf course, for which Summit County property owners—including Osguthorpe—agreed to grant the tracts of land necessary for the golf course's completion. The parties further agreed to give high priority to the golf course's development. The Development Agreement contained an arbitration provision, and it also permitted Summit County to declare the parties to be in default if certain conditions were not timely met.

## B. The State-Court Litigation

Soon enough, things began to sour between ASC Utah and Wolf Mountain. The proposed golf-course development stalled, and in May of 2006 Summit County declared

Wolf Mountain to have defaulted under the Development Agreement. Litigation rapidly ensued. In June of 2006, ASC Utah sued Wolf Mountain for various alleged breaches of the Ground Lease and Development Agreement. The lawsuit was brought in Summit County, Utah, district court, which sits in Utah's Third Judicial District. Wolf Mountain promptly countersued, and the state district court consolidated the ASC Utah and Wolf Mountain suits. At around the same time—in August of 2006—Osguthorpe brought a state-court action against Wolf Mountain, alleging breaches of their 1996 lease agreement. Osguthorpe initially filed its suit in Salt Lake County, but the Salt Lake County district court transferred the case to the neighboring Summit County court, where Osguthorpe also brought a separate action against ASC Utah in 2007. Over Osguthorpe's protests, the Summit County district court consolidated Osguthorpe's suits into the extant ASC Utah–Wolf Mountain litigation in August of 2008.

The next year saw two significant new developments in the ongoing litigation. First, Wolf Mountain sought the court's leave to add new parties to the suit. Upon the denial of its request, Wolf Mountain filed a demand for arbitration under the Development Agreement, along with a motion to compel arbitration. Although the litigation had proceeded in Summit County district court for the previous three years, this marked the first time that any party had invoked a purported right to arbitrate the dispute under the Development Agreement.

The Summit County district court denied Wolf Mountain's motion to compel arbitration, and Wolf Mountain appealed. In a published opinion, the Utah Supreme

Court upheld the state trial court's decision, holding that Wolf Mountain had waived its right to arbitrate by actively and substantially participating in the litigation for years before ever asserting a contractual right of arbitration. *See ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 245 P.3d 184, 194 (Utah 2010) ("Wolf Mountain clearly had the intent to pursue matters through litigation rather than to seek arbitration."). While acknowledging the importance of the contractual right of arbitration, the Utah Supreme Court explained that

> Utah public policy favors arbitration agreements only insofar as they provide a speedy and inexpensive means of adjudicating disputes, and reduce strain on judicial resources. In this case, enforcing the arbitration agreement would undercut both policy rationales: arbitration at this point would be neither a speedy and inexpensive way to adjudicate this dispute, nor a means of reducing strain on judicial resources. Public policy is better served by finding waiver where a party has participated in litigation to a point inconsistent with an intent to arbitrate, when such participation causes prejudice to the other party.

*Id.* at 197.

Also in 2009, Summit County declared that Osguthorpe had defaulted under the Development Agreement by failing to set aside the portion of its property needed for building the golf course. Because the issuance of the default notice gave rise to additional claims and defenses under the Development Agreement that had not previously been available to Osguthorpe, the Summit County district court reopened the pleadings to allow Osguthorpe to assert supplemental claims. On July 19, 2010, Osguthorpe brought new claims against both ASC Utah and Wolf Mountain under the Development Agreement. On September 20, 2010—during the pendency of Wolf

-6-

Mountain's appeal of the Summit County district court's denial of its motion to compel arbitration—Osguthorpe filed a "Motion to Compel Arbitration and to Stay All Claims in This Action Bearing on or Relating in Any Way to Any Alleged Default Under the [Development] Agreement" in state court. Osguthorpe argued that the arbitration clause in the Development Agreement required the arbitration of all claims and issues arising under the Development Agreement—not only those between Osguthorpe, ASC Utah, and Wolf Mountain, but also those that had been litigated solely between ASC Utah and Wolf Mountain.

The Utah Supreme Court issued its mandate in *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.* on November 19, 2010. The Honorable Robert K. Hilder, a Utah state-court judge and a defendant–appellee in this case, denied Osguthorpe's motion to compel arbitration, *inter alia*, the next day. In denying the motion, Judge Hilder noted that Osguthorpe was "situated differently from Wolf [Mountain] for several reasons, but not so differently that [it] can compel arbitration of any claims or defenses in this consolidated action." App. at 136 (emphasis omitted). This was because "the policies underlying arbitration have been so violated in this case that arbitration is not an option open to any party." *Id.* That said, Judge Hilder also recognized that Osguthorpe's supplemental claims arising under the Development Agreement were of much more recent vintage than the Development Agreement claims that had been litigated between ASC Utah and Wolf Mountain since 2006. In light of this fact, Judge Hilder gave Osguthorpe leave to dismiss any or all of its Development Agreement claims "without

prejudice to re-filing within a reasonable time after this case is adjudicated through a final and appealable judgment." *Id.* at 137. In other words, Osguthorpe could either (1) continue to litigate its Development Agreement claims in the consolidated action, or (2) voluntarily dismiss those claims and then submit them to arbitration after the conclusion of the ASC Utah–Wolf Mountain litigation in the consolidated action.

Finding neither course acceptable, Osguthorpe promptly appealed Judge Hilder's ruling to the Utah Supreme Court, where the interlocutory appeal remains pending.[4] Osguthorpe also asked Judge Hilder to recuse himself from hearing the case, to vacate his ruling on arbitration, and to stay the proceedings in Summit County pending the outcome of Osguthorpe's interlocutory appeal. After Judge Hilder denied these requests, Osguthorpe petitioned the Utah Supreme Court for emergency relief and for an immediate stay of all trial-court proceedings pending the resolution of its appeal. The Utah Supreme Court summarily denied Osguthorpe's petition on January 20, 2011.

## C. Proceedings in Federal District Court

Facing the prospect of imminent trial in Summit County district court, Osguthorpe turned to the federal courts for relief, filing this case in the United States District Court for the District of Utah on February 8, 2011. Osguthorpe asked the federal district court for several things. First, Osguthorpe requested a declaratory judgment that it had a right to arbitration, as guaranteed to it under the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

---

[4] Osguthorpe's interlocutory appeal before the Utah Supreme Court raises substantially the same issues under the Federal Arbitration Act, 9 U.S.C. §§ 1-16, that are presented in this case.

Osguthorpe also sought an order staying the state-court proceedings under 9 U.S.C. § 3[5] and an order compelling arbitration under 9 U.S.C. § 4.[6] In addition, Osguthorpe alleged under 42 U.S.C. § 1983 that Judge Hilder and Utah's Third Judicial District Court, as state actors operating under color of law, had violated Osguthorpe's due-process rights by conspiring with ASC Utah and Wolf Mountain to press forward with the state-court litigation and deprive Osguthorpe of its right to arbitration. In advancing its § 1983 claim, Osguthorpe asserted it had a property interest in its contractual right to arbitration under the Development Agreement that was protected under the Fourteenth Amendment to the United States Constitution. To this end, Osguthorpe requested a declaratory judgment from the federal district court that the state district court had violated Osguthorpe's due-process rights, and it sought an immediate injunction against ASC

[5] The terms of 9 U.S.C. § 3 provide:

If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

[6] The terms of 9 U.S.C. § 4 state in pertinent part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

Utah, Wolf Mountain, Judge Hilder, and the Third Judicial District Court "preventing each one and all of them from proceeding further with any proceedings in the consolidated state court case pending the issuance of a final arbitration award." App. at 29.

After filing its complaint, Osguthorpe presented the federal district court with a "Motion for Order Compelling Arbitration and to Stay, for a Temporary Restraining Order and Preliminary Injunction and for Expedited Resolution." Relying in the main on the *Rooker–Feldman* doctrine, the district court denied Osguthorpe's motion for lack of subject-matter jurisdiction.[7] Apart from its initial jurisdictional determination, the district court also found that "jurisdiction is improper under the *Younger* doctrine and the general principles of abstention."[8] App. at 1121. Osguthorpe immediately brought an

---

[7] The *Rooker–Feldman* doctrine takes its name from the two Supreme Court cases in which its rule has been applied: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The doctrine bars federal courts from reviewing the judgments and decisions of state courts once they have become final.

[8] The *Younger* abstention doctrine derives from *Younger v. Harris*, 401 U.S. 37 (1971). *Younger* instructs "that federal courts not interfere with state court proceedings by granting equitable relief—such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings—when such relief could adequately be sought before the state court." *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999). The Court in *Younger* gave two overarching reasons for the "long-standing public policy against federal court interference with state court proceedings." *Younger*, 401 U.S. at 43. The first reason is founded on "the basic doctrine of equity jurisprudence that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief." *Id.* at 43-44. The second—and "more vital"—ground is "the notion of 'comity,' that is, a proper respect for state functions." *Id.* at 44.

In denying Osguthorpe's motion, the federal district court suggested that the

-10-

interlocutory appeal of the district court's order in this court. Meanwhile, the federal-court defendants moved the federal district court to dismiss Osguthorpe's complaint. Agreeing with the defendants, the federal district court dismissed the action.[9] Arguing that Osguthorpe's federal-court suit was brought for a vexatious and frivolous purpose, ASC Utah moved for attorney's fees under 42 U.S.C. § 1988. After considering arguments on the issue, the federal district court awarded attorney's fees to ASC Utah in the amount of $42,923.00. Osguthorpe appeals these rulings.

## II. DISCUSSION

The federal district court primarily dismissed Osguthorpe's suit for lack of subject-matter jurisdiction under the *Rooker–Feldman* doctrine, but the court gave as alternate bases for dismissal the *Younger* abstention doctrine and "general principles of abstention." App. at 1121. On appeal,[10] the parties have devoted considerable briefing

---

*Younger* doctrine is jurisdictional. App. at 1121. This is not precisely correct. *Younger* is a doctrine of abstention. An abstention doctrine is one "under which a District Court may decline to exercise or postpone the exercise of its jurisdiction." *Cnty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188 (1959). This differs from a case in which the district court is barred at the outset from exercising its jurisdiction. That said, we also acknowledge that once a court has properly determined that *Younger* abstention applies, "there is no discretion to grant injunctive relief." *Colorado River*, 424 U.S. at 816 n.22.

[9] The defendants–appellees argue in their Response Brief that Osguthorpe has waived review of the federal district court's dismissal order by failing adequately to oppose dismissal. *See* Appellees' Br. at 2-4. We do not agree. After carefully reviewing the record of proceedings below, we are satisfied that Osguthorpe did not abandon its claim of error.

[10] In this case we consider three separate appeals. *See* note 1, *supra*. The first of these is an interlocutory appeal, No. 11-4062, that came to us following the federal district court's denial of Osguthorpe's motion for an order compelling arbitration and for a stay of the state-court proceedings. Later on, the federal district court dismissed the

-11-

and argument to the respective applicability of the doctrines of *Rooker–Feldman*, *Younger*, and, finally, *Colorado River*, the principles of which we believe are embraced by the phrase "general principles of abstention." For the reasons that follow, we hold the *Colorado River* doctrine controls the disposition of this case and mandates the dismissal of Osguthorpe's suit.

### A. The Threshold Matter of Jurisdiction and the Scope of Our Review

We review *de novo* the dismissal of a complaint for lack of subject-matter jurisdiction. *Chapman v. Oklahoma*, 472 F.3d 747, 749 (10th Cir. 2006). At the outset, we must conclude that the federal district court erred in dismissing the case under the *Rooker–Feldman* doctrine. This fact alone, of course, does not end our inquiry into the appropriateness of the federal district court's dismissal. It is well-established that "we are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Wells v. City and Cnty. of Denver*, 257 F.3d 1132, 1149-50 (10th Cir. 2001) (quotations and citations omitted).

As stated above, the federal district court alternatively relied on the *Younger* abstention doctrine and "general principles of abstention" as grounds for the suit's dismissal, and the parties have focused much of their arguments on the *Colorado River*

---

case, a ruling from which Osguthorpe also appeals. Our affirmance of the federal district court's dismissal renders Osguthorpe's first, interlocutory appeal moot. *See Sac & Fox Nation of Okla. v. Cuomo*, 193 F.3d 1162, 1168 (10th Cir. 1999).

-12-

doctrine.[11]  Even had they not done so, a court may raise the issue of abstention *sua sponte*.  *Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976); *Morrow v. Winslow*, 94 F.3d 1386, 1390-92 (10th Cir. 1996).  In *Quackenbush v. Allstate Insurance Co.* the Supreme Court observed that "it has long been established that a federal court has the authority to decline to exercise its jurisdiction when it 'is asked to employ its historic powers as a court of equity.'"  517 U.S. 706, 717 (1996) (quoting *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 120 (1981) (Brennan, J., concurring in judgment)).  Further describing the roots of our abstention doctrines, the Court said:

> Though we have thus located the power to abstain in the historic discretion exercised by federal courts sitting in equity, we have not treated abstention as a technical rule of equity procedure.  Rather, we have recognized that the authority of a federal court to abstain from exercising its jurisdiction extends to all cases in which the court has discretion to grant or deny relief.

*Id.* at 718 (internal quotation marks and citation omitted).  Abstention is thus fairly raised as a basis for affirming the federal district court's decision.

### B.  The Rooker–Feldman *Doctrine Is Not Applicable*

Because a question of subject-matter jurisdiction is implicated here, we pause briefly to explain why the *Rooker–Feldman* doctrine did not provide a sound foundation for dismissal in this case.  The *Rooker–Feldman* doctrine "has a narrow scope." *Chapman*, 472 F.3d at 749.  In the past, courts have on occasion been too eager to apply *Rooker–Feldman*, thereby overextending its reach.  The Supreme Court has recently

---

[11]  "We review district court decisions regarding deferral under the *Colorado River* Doctrine for abuse of discretion."  *Rienhardt*, 164 F.3d at 1302 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 19 (1983)).

made clear that the *Rooker–Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). In other words, "*Rooker–Feldman* applies only to suits filed after state proceedings are final." *Guttman v. Khalsa*, 446 F.3d 1027, 1032 (10th Cir. 2006).

Having considered the record before us, we cannot say that the proceedings in Utah state court are "final" within the meaning dictated by *Exxon Mobil*. [12] *Exxon Mobil* clarifies that the *Rooker–Feldman* doctrine is triggered only "after the state proceedings have ended." 544 U.S. at 291. After Judge Hilder denied Osguthorpe's motion to compel arbitration in the Summit County case, Osguthorpe appealed that ruling to the Utah Supreme Court. That state-court appeal remains unresolved, and on that basis alone we may conclude that the Utah state-court proceedings have not yet ended.

Osguthorpe filed its federal suit while its appeal of Judge Hilder's order was still pending before the Utah Supreme Court. Because the state-court proceedings are not

---

[12] We have cited with approval the First Circuit's formulation of when a state-court judgment becomes final under the *Rooker–Feldman* doctrine, as set forth post-*Exxon Mobil*: "(1) 'when the highest state court in which review is available has affirmed the judgment below and nothing is left to be resolved'; (2) 'if the state action has reached a point where neither party seeks further action'; or (3) 'if the state court proceedings have finally resolved all the federal questions in the litigation, but state law or purely factual questions (whether great or small) remain to be litigated.'" *Guttman*, 446 F.3d at 1032 (quoting *Federación de Maestros de Puerto Rico v. Junta de Relaciones del Trabajo de Puerto Rico*, 410 F.3d 17, 24-25 (1st Cir. 2005)).

final, the *Rooker–Feldman* doctrine cannot by itself bar the federal district court from hearing Osguthorpe's suit. The federal district court had subject-matter jurisdiction to hear the case. But jurisdiction, even though properly obtained, may—and sometimes must—be declined under the principles of abstention. *See Quackenbush*, 517 U.S. at 716 ("[W]e have held that federal courts may decline to exercise their jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum would clearly serve an important countervailing interest . . . .") (quoting *Colorado River*, 424 U.S. at 813) (internal quotation marks omitted)). Having previously concluded that the *Colorado River* doctrine governs our decision in this case, we need not decide whether abstention would also have been proper under the *Younger* doctrine.

### C. The Colorado River *Doctrine Is Applicable*

As a general rule, "'the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction . . . .'" *Colorado River*, 424 U.S. at 817 (quoting *McClellan v. Carland*, 217 U.S. 268, 282 (1910)). But, at times, "reasons of wise judicial administration" must weigh in favor of "permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding." *Id.* at 818. Granted, these occasions are not ordinarily encountered. Yet such "circumstances, though exceptional, do nevertheless exist." *Id.* We find the case before us to be exceptional enough to warrant dismissal under the *Colorado River* doctrine.

This case is about the tension that results when one lawsuit suddenly becomes two, each proceeding along tracks that, although parallel, are far from identical. *Colorado River* doctrine applies where, as here, we must decide whether such a state of affairs should continue—in other words, "whether a district court should have stayed or dismissed a federal suit pending the resolution of a parallel state court proceeding." *Rienhardt*, 164 F.3d at 1302. And, to be sure, a federal court will not and should not shy away from contemporaneously exercising concurrent jurisdiction with a state court in the ordinary course of things. But this is no ordinary case.

We recognize, as we must, the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colorado River*, 424 U.S. at 817; *see also England v. Louisiana State Bd. of Med. Exam'rs*, 375 U.S. 411, 415 (1964) ("'When a Federal court is properly appealed to in a case over which it has by law jurisdiction, it is its duty to take such jurisdiction . . . .'") (quoting *Willcox v. Consol. Gas Co. of N.Y.*, 212 U.S. 19, 40 (1909)); *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821) ("We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given."). But this obligation, although great, is not absolute. "[T]he proposition that a court having jurisdiction must exercise it, is not universally true . . . ." *Canada Malting Co. v. Paterson S.S., Ltd.*, 285 U.S. 413, 422 (1932). It is well-established that "federal courts have the power to refrain from hearing," among other things, "cases which are duplicative of a pending state proceeding." *Quackenbush*, 517

U.S. at 716-17. This latter principle—the avoidance of duplicative litigation—is at the core of the *Colorado River* doctrine.

*Colorado River* concerns itself with efficiency and economy. Its goal is "to preserve judicial resources."[13] *Rienhardt*, 164 F.3d at 1302. In announcing its reasons for adopting the doctrine, the Court in *Colorado River* explained:

> Although this case falls within none of the abstention categories, there are principles unrelated to considerations of proper constitutional adjudication and regard for federal-state relations which govern in situations involving the contemporaneous exercise of concurrent jurisdictions, either by federal courts or by state and federal courts. These principles rest on considerations of "(w)ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation."

424 U.S. at 817 (quoting *Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co.*, 342 U.S. 180, 183 (1952)). The Court provided four factors to aid in determining whether dismissal was warranted. These four factors are: (1) whether the state or federal court first assumed jurisdiction over the same res; (2) "the inconvenience of the federal forum"; (3) "the desirability of avoiding piecemeal litigation"; and (4) "the order in which jurisdiction was obtained by the concurrent forums." *Id.* at 818. The Court also advised that "[n]o one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counselling against that exercise is required." *Id.* at 818-19; *see also Moses H. Cone Mem'l Hosp. v.*

---

[13]     This sets it apart from the abstention doctrines that preceded it. In the strictest sense, the *Colorado River* doctrine is not an abstention doctrine at all. Rather, it is a judicially crafted doctrine of efficiency that arose to fill a gap in the federal courts' existing inventory of abstention principles. *See Colorado River*, 424 U.S. at 817-18 (distinguishing between dismissal under abstention doctrines and dismissal "for reasons of wise judicial administration").

*Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983) (stating that the *Colorado River* factors are not a "mechanical checklist," "careful balancing" is required, and "[t]he weight to be given to any one factor may vary greatly from case to case").

Bearing in mind these considerations, we now turn to whether the federal district court properly dismissed Osguthorpe's suit. As an initial matter, we find that the first of the *Colorado River* factors does not apply to this case. Neither the state nor district court has acquired jurisdiction over property in the course of this litigation. That is to say, this is not an action in rem or quasi in rem. We also afford scant weight to the second factor, the relative inconvenience of the federal forum. The state-court action began in Summit County, Utah, which borders Salt Lake County, Utah, the site of the federal district court. The state and federal courthouses involved in this case are at no great geographical distance from each other, and no party has suggested any physical or logistical inconvenience suffered as a result of litigating in dual forums.

But the latter two factors weigh heavily on our analysis. The "paramount" consideration in *Colorado River* was the third factor: "the danger of piecemeal litigation." *See Moses H. Cone*, 460 U.S. at 19. And so it is with us in this case. This lawsuit was initiated in Utah state court on June 14, 2006, when ASC filed its complaint against Wolf Mountain. Osguthorpe began its participation in state-court litigation in August of that same year, when it brought its own suit, later consolidated, against Wolf Mountain. From that time until February of 2011, when Osguthorpe filed its suit in federal court, the parties aggressively litigated this sprawling case in state court. This

fact is amply illustrated by the mammoth size of the Summit County district court's docket for this case. It contains thousands of entries and spans nearly two hundred pages in the record. *See* App. at 555-728. The scope of the state-court litigation—and the accompanying strain on the judicial resources of the state court—was pointedly described by Judge Hilder in refusing to compel arbitration of the Development Agreement claims:

> [T]his case (or more correctly, these cases) have proven to be one of the greatest consumers of the resources of the Third District Court in many years. The litigation has consumed years of intensive court involvement, voluminous motion practice, extensive discovery, and even substantial physical resources as basic as paper, copy toner, and storage space. This consolidated case comprises more file volumes than any presently pending case in this District that serves more than one million citizens of this state. It is also now on its third judge and fourth or fifth law clerk. . . . [T]he point is that court resources have already been consumed almost to exhaustion.

*Id.* at 134-35.

At the time Judge Hilder wrote those words, the case had been litigated in Utah state court for more than four years. During that time, the litigation had become profoundly intertwined with the machinery of the Utah judicial system. Parallel proceedings had not yet begun in federal court and would not for several more months—a consideration that ties into the fourth *Colorado River* factor. Under this factor, we look to the order in which the state and federal courts obtained jurisdiction over the matter. In applying this factor, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone*, 460 U.S. at 21. Here, the Utah state court had already overseen years of intensive litigation before the federal court's jurisdiction was invoked.

All progress in this case, in other words, has been made in the state court. The Court in *Colorado River* emphasized that "[o]nly the clearest of justifications will warrant dismissal." 424 U.S. at 819. We find the clearest of justifications to be present here.

Our holding is bulwarked by the Supreme Court's later decision in *Moses H. Cone*. In that case, the Court supplemented its original *Colorado River* framework with additional factors for courts to weigh when deciding the appropriateness of abstention. Following *Moses H. Cone*, we may also look to whether "federal law provides the rule of decision on the merits," 460 U.S. at 23, and whether the state-court proceedings adequately protect the litigants' rights, *id.* at 26-27. In dictum, the Court also strongly suggested that a court may take into account the possibly "vexatious or reactive nature of either the federal or the state litigation." *Id.* at 17 n.20.

Although it is true that the Federal Arbitration Act will govern the merits of Osguthorpe's arbitration claims, this factor does not automatically compel the conclusion that the resolution of a claim arising under the Act is a task better suited for the federal courts. Indeed, "[s]tate courts rather than federal courts are most frequently called upon to apply the Federal Arbitration Act." *Nitro-Lift Techs., L.L.C. v. Howard*, 133 S. Ct. 500, 501 (2012) (per curiam). Further, the bare fact that Osguthorpe has thus far failed to obtain its desired outcome in Utah state-court litigation does not give us sufficient reason to think that Osguthorpe's rights are somehow less protected in the Utah state-court proceedings. And it has also not escaped our attention that Osguthorpe came to the

federal courts for relief only after receiving an unfavorable state-court ruling on arbitrability several years after litigation had begun in Utah's state-court system.

In *Moses H. Cone*, the Court found that the federal district court had improperly stayed the state-court proceedings under *Colorado River*. But the parallel state- and federal-court proceedings in *Moses H. Cone* were initiated within weeks—not years—of each other. This case has been interwoven with a state-court system—on both the trial and appellate levels—on a scale simply not seen in *Moses H. Cone*. *Moses H. Cone* did not present the exceptional case warranting *Colorado River* abstention; this case does. Above all, the *Colorado River* factors must "be applied in a pragmatic, flexible manner with a view to the realities of the case at hand." *Moses H. Cone*, 460 U.S. at 21. Guided by this bedrock principle of judicial administration, we now hold that this case should live out the rest of its days in the place where it began: the Utah state courts. Having concluded that dismissal was proper in this case under *Colorado River* doctrine, we do not think it necessary to discuss the merits of Osguthorpe's other arguments on the arbitrability of the Development Agreement claims.

*D. The Award of Attorney's Fees*

After the federal district court dismissed this suit, ASC Utah asked for attorney's fees under 42 U.S.C. § 1988(b).[14] Section 1988(b) provides that, in an action brought to vindicate a party's civil rights under 42 U.S.C. § 1983, *inter alia*, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the

---

[14] Only ASC Utah sought attorney's fees in the federal-court action.

costs." In a § 1983 action, "[a] prevailing defendant may recover an attorney's fee only where the suit was vexatious, frivolous, or brought to harass or embarrass the defendant." *Hensley v. Eckerhart*, 461 U.S. 424, 429 n.2 (1983). Arguing that Osguthorpe's federal suit was both vexatious and frivolous, ASC Utah asked the federal district court to award it the costs incurred in defending against the suit—an amount ASC Utah alleged to be $42,923.00. The federal district court agreed with ASC Utah, finding that Osguthorpe's lawsuit was both vexatious and frivolous and awarding ASC Utah the full amount of its requested attorney's fees.

We review a district court's award of attorney's fees for an abuse of discretion, but we review *de novo* "the district court's application of the legal principles underlying that decision." *United States* ex rel. *Grynberg v. Praxair, Inc.*, 389 F.3d 1038, 1055 (10th Cir. 2004). In *Grynberg*, we acknowledged that a district court may still award attorney's fees after dismissing the underlying action for lack of subject-matter jurisdiction.[15] *Id.* at 1055-58. This is because a claim for attorney's fees gives rise to issues separate and distinct from the merits of the original cause of action. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990) ("It is well established that a federal court may consider collateral issues after an action is no longer pending."). In this case, the federal district court principally relied on the *Rooker–Feldman* doctrine in dismissing Osguthorpe's suit for want of subject-matter jurisdiction. As stated above in section II.B, the federal district

---

[15] Although our decision in *Grynberg* did not deal with an award of fees under § 1988, we thoroughly considered similar language in other fee-shifting statutes. We think *Gyrnberg*'s rule also extends to § 1988 fee awards.

court's reliance on *Rooker–Feldman* was misplaced because the state-court proceedings are not yet "final" in the sense required by that doctrine. Abstention under *Colorado River*, not dismissal for lack of subject-matter jurisdiction, was the proper course. Having said that, we believe *Grynberg*'s reasoning applies with equal force to cases dismissed under doctrines of abstention. In other words, a district court may abstain from hearing a case and still retain the power to consider a prevailing defendant's request for attorney's fees.

We are satisfied that the federal district court had jurisdiction to consider ASC Utah's motion for attorney's fees. Our more immediate concern in this case is the lack of specific factual findings by the federal district court in support of its decision to award those fees. "In order to provide meaningful appellate review, we require an articulation of the district court's rationale." *Grynberg*, 389 F.3d at 1059. Although the federal district court held a short hearing on ASC Utah's motion for fees, it appears from our study of the record that the court mainly used this abbreviated hearing to announce its decision and to ask ASC Utah to prepare an application for fees. *See* App. at 1872-73. More specifically, the district court stated, "I have read your briefing on this matter. This is the Court's disposition to find that the suit here in federal court is both frivolous and vexatious, and the only question I am here to consider is the amount of the fee." *Id.* at 1872. Without a more detailed explanation of why the federal district court reached its conclusions, we simply are unable to determine whether the district court "made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."

*Grynberg*, 389 F.3d at 1058 (citation and internal quotation marks omitted).  We must vacate the award of attorney's fees to ASC Utah and remand to the federal district court, instructing it to make specific and detailed findings of fact to support its award.

### III.    CONCLUSION

For the reasons stated, we AFFIRM the district court's dismissal and DISMISS AS MOOT the interlocutory appeal of the district court's order denying the motion to compel arbitration and for a stay of the state-court proceedings.  Finally, we VACATE the district court's award of attorney's fees and REMAND the matter to the district court for detailed findings of fact sufficient to afford meaningful appellate review of its award.

11-4062 - *D.A. Osguthorpe Family Partnership v. ASC Utah, Inc.*

**HARTZ**, Circuit Judge, concurring:

I join Judge Holloway's opinion but add a few words to express skepticism that the district court will be able to state a proper ground for the attorney-fee award.

The Appellees sought attorney fees on the ground that the suit was frivolous and vexatious. As I understand their brief, however, the "vexatious" ground is dependent on the complaint having been frivolous. I will therefore address only whether the complaint was frivolous.

Perhaps the district court determined that the complaint was frivolous because there was obviously no federal jurisdiction. But it was incorrect in ruling that it lacked jurisdiction under the *Rooker-Feldman* doctrine; and even though we hold that it was proper for the district court to abstain under the *Colorado River* doctrine, I do not think that the contrary view is a frivolous one.

The other alternative is that the district court determined that the complaint was frivolous on the merits. But such a justification for the attorney-fee award would be inconsistent with *Colorado River* abstention. If the claims are frivolous, then they can be decided readily, the inconvenience of any possible piecemeal litigation is minimal, and there would be scant reason for abstention.