**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**January 6, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

UTE INDIAN TRIBE OF THE UINTAH
AND OURAY RESERVATION, a
federally recognized Indian Tribe and a
federally chartered corporation; UINTAH
AND OURAY TRIBAL BUSINESS
COMMITTEE; UTE ENERGY
HOLDINGS, a Delaware LLC,

    Plaintiffs - Appellants,

v.

BARRY G. LAWRENCE, District Judge,
Utah Third Judicial District Court, in his
individual and official capacities; LYNN
D. BECKER,

    Defendants - Appellees.

No. 18-4013

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:16-CV-00579-CW)**
_____

Frances C. Bassett and Thomasina Real Bird (Thomas W. Fredericks and Jeremy J.
Patterson, with them on the briefs), Fredericks Peebles & Morgan LLP, Louisville,
Colorado, for Plaintiffs-Appellants.

David K. Isom, Isom Law Firm PLLC, Salt Lake City, Utah, for Defendant-Appellee
Lynn D. Becker.

Nancy J. Sylvester (Brent M. Johnson, with her on the brief), Administrative Office of
the Courts, Utah District Court, Salt Lake City, Utah, for Defendant-Appellee Judge
Barry G. Lawrence.

_____

Before **MORITZ**, **BRISCOE**, and **EID**, Circuit Judges.

_____

**MORITZ**, Circuit Judge.

_____

This appeal marks the latest chapter in a long-running contract dispute between the Ute Indian Tribe of the Uintah and Ouray Reservation (the Tribe)[1] and Lynn Becker, a non-Indian. The contract concerned Becker's work marketing and developing the Tribe's mineral resources on the Ute reservation. Almost seven years ago, Becker sued the Tribe in Utah state court for allegedly breaching the contract by failing to pay him a percentage of certain revenue the Tribe received from its mineral holdings. Later, the Tribe filed this lawsuit, challenging the state court's subject-matter jurisdiction under federal law. The district court denied the Tribe's motion for a preliminary injunction against the state-court proceedings, and the Tribe appeals.

We reverse and hold that the Tribe is entitled to injunctive relief. The district court's factual findings establish that Becker's state-court claims arose on the reservation because no substantial part of the conduct supporting them occurred elsewhere. And because the claims arose on the reservation, the state court lacks subject-matter jurisdiction absent congressional authorization. But contrary to the

---

[1] As in prior iterations of this dispute, this appeal is brought not only by the Tribe but also "the Uintah and Ouray Tribal Business Committee (the Tribe's elected governing body)" and "Ute Energy Holdings, LLC (whose 100% owner and sole member is the Tribe)." *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 875 F.3d 539, 540 n.1 (10th Cir. 2017). "Because the appellants raise identical arguments, we will generally refer to them all as the Tribe." *Id.*

district court's ruling, 25 U.S.C. § 1322 does not provide such authorization. Section 1322 requires tribal consent to state-court jurisdiction, and tribal consent is obtained only by holding a special election under 25 U.S.C. § 1326. Here, the Tribe never provided such consent. Thus, the Tribe succeeds on the merits of its claim that the state court lacks subject-matter jurisdiction. The Tribe further satisfies the other requirements for obtaining injunctive relief. Accordingly, under the particular circumstances of this appeal, we close this chapter in Becker's dispute with the Tribe by ordering the district court to permanently enjoin the state-court proceedings.

## Background

The contract dispute at the heart of this appeal has spawned lawsuits in federal, state, and tribal court. Our court alone has issued four separate opinions. *See Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 770 F.3d 944 (10th Cir. 2014) (*Becker I*); *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 868 F.3d 1199 (10th Cir. 2017) (*Becker II*); *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Lawrence*, 875 F.3d 539 (10th Cir. 2017) (*Lawrence*); *Becker v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 11 F.4th 1140 (10th Cir. 2021) (*Becker III*).[2] Those opinions provide detailed accounts of both the underlying contract dispute and the dense procedural history that followed. We therefore provide an abridged version of this history, covering only the events relevant to the appeal before us.

---

[2] *Becker III* was initially consolidated with this appeal, and the cases were argued together.

Becker's formal relationship with the Tribe began in 2004, when the Tribe hired him to help market and develop the Tribe's vast mineral resources. During Becker's time working for the Tribe, those resources were located exclusively within the borders of the Ute reservation. Becker and the Tribe executed a contract, which we refer to as "the Agreement," under which Becker would receive for his services an annual salary and 2% of certain revenue the Tribe accrued through its various mineral holdings. After Becker and the Tribe terminated their relationship in late 2007 or early 2008, a dispute arose over the Tribe's purported failure to pay Becker the 2% interest. So in 2014, Becker sued the Tribe in Utah state court for breach of contract, breach of the implied covenant of good faith and fair dealing, and unjust enrichment.[3] Judge Barry Lawrence denied the Tribe's motion to dismiss for lack of subject-matter jurisdiction and eventually set the case for trial.

In June 2016, about a year after Judge Lawrence denied the Tribe's motion to dismiss the state-court action, the Tribe filed this federal lawsuit against Becker and Judge Lawrence, challenging in part the state court's subject-matter jurisdiction under federal law. Initially, the district court determined that it lacked federal subject-matter jurisdiction to consider the Tribe's challenge and dismissed the case. We reversed and remanded for further proceedings, holding that "the Tribe's claim—that federal law precludes state-court jurisdiction over a claim against Indians arising

---

[3] Becker initially brought these claims in federal court, but the district court dismissed them for lack of federal subject-matter jurisdiction under 28 U.S.C. § 1331, and we affirmed. *See Becker I*, 770 F.3d at 948–49.

on the reservation—presents a federal question that sustains federal jurisdiction."

*Lawrence*, 875 F.3d at 540.

On remand, the Tribe reasserted its position that the state court lacked subject-matter jurisdiction in a motion for both preliminary and permanent injunctions against the state-court proceedings. Rather than take up those motions, the district court sua sponte directed the parties to address a different issue, resulting in an order that purported to avoid consideration of the Tribe's motions on supplemental-jurisdiction grounds.[4]

The Tribe then filed this appeal, but we abated it, instructing the district court to follow *Lawrence*'s mandate and "decide the Tribe's request for injunctive relief against the state[-]court proceedings." App. vol. 8, 1541. The district court ultimately denied a preliminary injunction, finding that the Tribe was unlikely to succeed on the merits of its claim that the Utah state court lacks jurisdiction. In so doing, it reasoned that even assuming Becker's claims involve events that occurred on the reservation, a

---

[4] The district court may have misinterpreted our statement in *Lawrence* that on remand, it "should address in the first instance whether the Tribe's claims for declaratory relief fall within its supplemental jurisdiction." 875 F.3d at 548. As the Tribe pointed out below, the only declaratory claims "that conceivably require[d] the exercise of supplemental jurisdiction [we]re the Tribe's alternative claims" about the Agreement's validity and sovereign immunity. App. vol. 3, 510 (emphasis omitted). Supplemental jurisdiction was not required for the Tribe's primary claim, that the state court lacked jurisdiction; *Lawrence* held that federal-question jurisdiction existed for that claim. *See* 875 F.3d at 543–44.

federal statute authorizes state-court jurisdiction over such claims.[5] *See* 25 U.S.C. § 1322.

We then lifted the abatement. But following oral argument, we abated the appeal for a second time, ordering the district court to make supplemental factual findings on the issue it had merely assumed—whether Becker's state-court claims arose from events that occurred on the reservation. The district court eventually issued supplemental findings[6] and certified the supplemental record to this court. Having lifted the second abatement, we now resolve the Tribe's appeal.

## Analysis

We review the district court's decision to deny a preliminary injunction for abuse of discretion. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011). The district court abuses its discretion if it "commits a legal error," if it "relies on clearly erroneous factual findings," or if "there is no rational basis in the evidence for its ruling." *Id.* (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

To obtain a preliminary injunction, the moving party must show that (1) it is substantially likely to prevail on the merits; (2) it will suffer irreparable harm without

---

[5] Four days before the district court ruled, the Tribe moved to sanction Becker and his counsel for making allegedly disparaging comments about the Tribe. In this appeal, the Tribe argues that "the district court erred in denying" this motion. Aplt. Br. 51 (capitalization omitted). Yet it acknowledges that "[t]he district court has never ruled on the . . . motion," and it suggests that the district court erred in failing to do so. *Id.* Because the motion remains pending in the district court, it is not ripe for our review and we do not resolve it here.

[6] We discuss those findings, as relevant, below.

the injunction; (3) this threatened injury outweighs the harm that granting the injunction may cause the opposing parties; and (4) the injunction will not adversely affect the public interest. *Becker II*, 868 F.3d at 1202. Here, the district court concluded that the Tribe failed the first requirement—it had not shown a substantial likelihood of success on its claim that federal law precludes the state court from exercising jurisdiction over Becker's lawsuit. On appeal, the Tribe challenges that conclusion, arguing that it can show even more than a likelihood of success on the merits—it can show *actual* success on the merits. The Tribe further argues that it satisfies the remaining injunction requirements and thus asks, as a remedy, that we order the district court to grant a permanent injunction.

## I.     The State Court's Jurisdiction

The Tribe argues that the Utah state court lacks subject-matter jurisdiction over Becker's lawsuit as a matter of federal law. Admittedly, federal law usually plays a limited role in assessing whether a state court has jurisdiction because state courts, as courts of general jurisdiction, can hear a wide variety of cases. 13 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3522 (3d ed. 2021) ("Most state courts are courts of general jurisdiction, and the presumption is that they have subject matter jurisdiction over any controversy unless a showing is made to the contrary."); *cf. Aldinger v. Howard*, 427 U.S. 1, 15 (1976) ("[F]ederal courts, as opposed to state trial courts of general jurisdiction, are courts of limited jurisdiction marked out by Congress."). But this general jurisdiction does not necessarily hold true when a case involves a tribe or its members. Instead, state

7

courts' "adjudicative authority over Indians for on-reservation conduct is greatly limited by federal law." *Lawrence*, 875 F.3d at 542.

These limits reflect a longstanding federal policy—enforceable against the states under the federal government's plenary and exclusive constitutional authority "to legislate in respect to Indian tribes"—of "leaving Indians free from state jurisdiction and control." *Id.* at 541–42 (first quoting *United States v. Lara*, 541 U.S. 193, 200 (2004), and then quoting *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 168 (1973)); *see also Williams v. Lee*, 358 U.S. 217, 220, 223 (1959) (noting that Congress has "acted consistently upon the assumption that the [s]tates have no power to regulate the affairs of Indians on a reservation" and that judicial precedents "have consistently guarded the authority of Indian governments over their reservations"). Thus, when a case brought against a tribe or its members "aris[es] from conduct in Indian country," state courts lack jurisdiction "absent clear congressional authorization." *Navajo Nation v. Dalley*, 896 F.3d 1196, 1204 (10th Cir. 2018). On the other hand, such authorization is generally not required if the claims stem from events occurring off tribal land.[7]

---

[7] We say "generally" because specific treaties and federal statutes limit state-court jurisdiction over specific off-reservation claims "that might otherwise be brought in state court." 1 Cohen's Handbook of Federal Indian Law § 7.03(1)(a)(i) (2019). And of course, even if a state court has *jurisdiction* over such claims, tribal sovereignty may independently prevent it from ultimately adjudicating them. *Id.* (noting that tribal sovereign immunity "bars suits against tribes in state court, even for cases involving off-reservation conduct"); *see also Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014) (declining to revisit "prior decisions holding that, absent [congressional abrogation or waiver], Indian tribes have immunity even when a suit arises from off-reservation commercial activity").

Accordingly, to assess the Tribe's argument that the state court lacks jurisdiction over this dispute, we consider (1) whether Becker's claims arose on the reservation; and (2) if they did, whether Congress has authorized state-court jurisdiction over such claims.

### A.    Where Becker's Claims Arose

The Supreme Court has never set out a precise standard for determining whether a lawsuit or a claim arose in Indian country. Even so, its precedents make clear that the inquiry requires examination of where the material factual events underlying the plaintiff's claims occurred.[8] In *Williams*, for example, a non-Indian sued a Navajo couple in state court to recover a debt stemming from goods sold at the non-Indian's store located on tribal land. 358 U.S. at 217–18. The Court held that the state court lacked jurisdiction over that claim, which it described as "aris[ing] on an Indian reservation." *Id.* at 218; *see also id.* at 223 (noting that plaintiff "was on the [r]eservation and the transaction with an Indian took place there"). And in *Fisher v. District Court of Montana*, the Court stated that an adoption proceeding between

---

[8] The Tribe sometimes frames this inquiry in terms of "minimum contacts," a phrase typically associated with the standard for *personal* jurisdiction. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (holding that states may exercise personal jurisdiction over out-of-state defendants with "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'" (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940))). But whether the Utah state court may assert *personal* jurisdiction over the Tribe is distinct from the issue we face here—whether federal law deprives the state court of *subject-matter* jurisdiction. *See* 1 Cohen's Handbook of Federal Indian Law § 7.03(1)(b) n.15 (2019) (noting that jurisdictional bar "against state courts hearing actions that arise on the reservation is broader than the [personal-jurisdiction] requirement that a dispute have minimum contacts with the forum").

9

tribal parties who resided on a reservation could not be brought in state court because the proceeding was "appropriately characterized as litigation arising on the Indian reservation." 424 U.S. 382, 389 (1976) (per curiam). In doing so, it noted one party's failure to argue that "any substantial part of the conduct supporting the adoption petition took place off the reservation." *Id.*; *see also id.* at 389 n.14 ("[I]t appears that none of the acts giving rise to the adoption proceedings occurred off the reservation.").

For some claims, determining that the material conduct occurred on tribal land is a straightforward task. A tort claim based on a slip-and-fall injury at a casino on a reservation, for instance, clearly "aris[es] on Indian land." *Dalley*, 896 F.3d at 1200, 1204–05. So does a lawsuit "springing from [an] on-reservation automobile accident[]." *Crawford v. Genuine Parts Co.*, 947 F.2d 1405, 1408 (9th Cir. 1991). We cannot so easily classify Becker's claims as arising on the reservation, however, because the district court's supplemental factual findings suggest that at least some of the underlying events took place off the reservation.

As a result, we assess the district court's factual findings to determine whether any "substantial part of the conduct supporting the [claims] took place off the reservation."[9] *Fisher*, 424 U.S. at 389; *cf. also* 1 Cohen's Handbook of Federal Indian

---

[9] In so doing, we review the district court's factual findings for clear error. *See Crowe & Dunlevy*, 640 F.3d at 1157. Whether those findings establish that Becker's claims arose on the reservation, however, is a legal question we consider de novo. *See Norton v. Ute Indian Tribe of the Uintah & Ouray Rsrv.*, 862 F.3d 1236, 1242 (10th Cir. 2017) (noting de novo review of legal conclusions in preliminary-injunction appeal).

Law § 6.01(5) (2019) ("Where activities occur partially within and partially outside Indian country, and a substantial part of the activity takes place outside, courts have generally upheld nondiscriminatory applications of state jurisdiction."). In a contract case like Becker's, this inquiry involves several factors, including where the parties executed, negotiated, and performed the contract; where the contract subject matter is located; and where the parties reside. *See R.J. Williams Co. v. Fort Belknap Hous. Auth.*, 719 F.2d 979, 985 (9th Cir. 1983). When weighing these factors, we "evaluat[e] each [one] according to its relative importance with respect to the dispute." *Id.*

The district court's findings establish that the parties executed the Agreement on the reservation. The district court found that the Tribe's Business Committee Chair signed the Agreement at tribal headquarters on the reservation, citing undisputed statements to that effect from two witnesses. As for Becker, the district court concluded it was "unclear where [he] executed" the Agreement. Supp. App. vol. 3, 25. But the record reveals no such uncertainty. True, Becker himself testified that he did not recall where he signed the Agreement. But he also specifically testified that he and the Chair signed the Agreement at the same time. Supp. App. vol. 2, 483 (stating that during conversation with Chair, "*we* signed the Agreement" (emphasis added)). Thus, given the undisputed evidence that the Chair signed on the reservation, the only reasonable inference is that Becker also signed on the reservation, and the district court clearly erred in concluding otherwise. *See McDonnell v. City & Cty. Of Denver*, 878 F.3d 1247, 1256–57 (10th Cir. 2018)

11

(factual finding supporting district court's preliminary-injunction analysis was clearly erroneous "[b]ecause there [wa]s no record support for [it]"). Because both parties signed on the reservation, the place-of-execution factor favors concluding that Becker's contract claims arose on the reservation.

The place-of-performance factor likewise supports the conclusion that Becker's claims arose on the reservation. The district court interpreted the record as inconclusive on where the Tribe performed, explaining that "[n]o evidence was submitted to suggest that [it] performed [its] obligations on, or off of, [t]ribal [l]and." Supp. App. vol. 3, 24. That statement is puzzling given the district court's recognition that, "[b]ecause the Tribe is not a natural person," its conduct "must be interpreted through its . . . ordinances, resolutions, and actions." *Id.* at 6. Such conduct necessarily occurred on the reservation where, as the district court also recognized, the Tribe conducts its business from tribal headquarters. Thus, absent any contrary evidence, we fail to see how the Tribe could have performed (or failed to perform) its contractual duties from anywhere but the reservation. *See Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1184 (10th Cir. 2009) ("[I]nternally inconsistent findings constitute clear error." (quoting *John Allan Co. v. Craig Allen Co.*, 540 F.3d 1133, 1139 (10th Cir. 2008))).

As for Becker, the district court found that he devoted a substantial amount of time to working both on and off the reservation. We take no issue with the district court's factual findings on this point. The district court estimated that Becker worked off the reservation "[a]pproximately half" or "[a]t least half" of the time, either

12

working remotely (rather than in his on-reservation office) or traveling out of state or to other Utah cities for business meetings. *Id.* at 23, 25. Becker's appellate brief points to a similar figure and emphasizes this off-reservation work.

Yet as the district court acknowledged, all that off-reservation work served the Tribe's minerals interests which were located entirely within reservation boundaries. For example, when Becker attended meetings in other states, he did so "to effectively market and monetize [the Tribe's] minerals," which "were located on [t]ribal [l]and." *Id.* at 22. The same is true for meetings Becker attended within Utah but off the reservation, which were "devoted to issues 'relating . . . to . . . the Tribe's surface or mineral estate within the exterior boundaries of the reservation." *Id.* at 23 (quoting Supp. App. vol. 2, 490). Thus, the nature of Becker's duties diminishes the significance of Becker's off-reservation work. Moreover, at least half of Becker's time was devoted to working on the reservation.

Finally, we find the location of the Agreement's subject matter especially significant. *See R.J. Williams*, 719 F.2d at 985 ("When a contract concerns a specific physical thing, such as land or a chattel, the location of the thing is regarded as highly significant."). The Agreement concerned Becker's work marketing and developing tribal mineral assets located exclusively within the reservation; as the district court put it, "[a]t all times relevant to this matter, the Tribe did not acquire or own oil, gas, or mineral interests in lands off of" the reservation. Supp. App. vol. 3, 5. And as mentioned, while Becker may have performed some tasks off tribal land, his actions were always in furtherance of his role managing those resources. This

13

factor overwhelmingly supports the conclusion that Becker's claims arose on the reservation.

To summarize, both parties signed the Agreement on the reservation, and the Tribe necessarily performed its duties there. And crucially, even though Becker performed his duties off the reservation about half of the time, his work was always in service of his role managing tribal mineral resources located on the reservation. For these reasons, we conclude that no "substantial part" of the conduct supporting Becker's claims occurred off the reservation. *Fisher*, 424 U.S. at 389. Becker's case is therefore "appropriately characterized as litigation arising on [an] Indian reservation." *Id.*

## B.    Whether Congress Authorized State-Court Jurisdiction

Because Becker's claims against the Tribe arose on the reservation, the Utah state court could exercise jurisdiction over the dispute only with "clear congressional authorization." *Dalley*, 896 F.3d at 1204. The district court determined that 25 U.S.C. § 1322 supplies such authorization. As explained in more detail below, that statute allows states to acquire jurisdiction over "civil causes of action arising within . . . Indian country" and involving Indian parties.[10] § 1322(a), (b). But state-court

---

[10] More precisely, the statute applies to claims arising in Indian country "between Indians or to which Indians are parties." § 1322(a). "Because this language refers only to individual Indians," it arguably does not apply to suits against tribes themselves. 1 Cohen's Handbook of Federal Indian Law § 6.04(3)(b)(v) (2019); *see also Lawrence*, 875 F.3d at 546 n.4 (acknowledging that "there may be a question whether [§ 1322] applies to suits against tribes, as opposed to individual Indians"). Indeed, the Tribe argues as much in this appeal. The dissent likewise submits (and would find dispositive on the § 1322 issue) that "§ 1322 addresses only suits

jurisdiction under § 1322 "requires certain prelitigation action." *Lawrence*, 875 F.3d at 545–46. The Tribe argues that one such prelitigation action is tribal consent; that is, a tribe must agree in advance to a state's assumption of § 1322 jurisdiction. And because the Tribe has never consented to Utah courts exercising § 1322 jurisdiction, the Tribe contends, that statute does not supply the Utah state court with jurisdiction over Becker's case.

We agree. States may only assume jurisdiction under § 1322(a) "with the consent of the tribe occupying the particular Indian country . . . which would be affected by such assumption."[11] § 1322(a). A neighboring provision, 25 U.S.C. § 1326, specifies the procedure for obtaining a tribe's consent: "[T]he enrolled Indians within the affected area" must "accept such jurisdiction by a majority vote of the adult Indians voting at a special election held for that purpose." If a tribe has not expressed its consent by holding a special election, a state's courts cannot exercise § 1322 jurisdiction. *Kennerly v. Dist. Ct. of Mont.*, 400 U.S. 423, 429 (1971) (per curiam) ("[T]he tribal consent that is prerequisite to the assumption of state

---

involving individual Indians, not [t]ribes." Dissent 10. We need not consider this issue: Regardless of whether § 1322 applies to suits against tribes, it does not apply here because—as we explain in the text—the Tribe did not consent.

[11] Congress added the tribal-consent requirement in 1968 and made it applicable to all future assumptions of civil jurisdiction by states. *See Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 493 n.40 (1979) ("The 1968 legislation provides that [s]tates that have not [yet] extended . . . civil jurisdiction to Indian country can make future extensions only with the consent of the tribes affected."). The tribal-consent requirement applies to Utah because it did not pass legislation accepting § 1322 jurisdiction until after the 1968 amendment. *See Lawrence*, 875 F.3d at 546 n.4.

jurisdiction . . . must be manifested by majority vote of the enrolled Indians within the affected area of Indian country."). Here, Becker does not suggest that the Tribe ever held a special election accepting Utah's assumption of § 1322 jurisdiction; nor does any record evidence suggest that such an election took place. *See Lawrence*, 875 F.3d at 546 n.4; 1 Cohen's Handbook of Federal Indian Law § 6.04(3)(a) & n.49 (2019) (noting that "Utah passed legislation accepting jurisdiction subject to subsequent tribal consent" but that "no tribes . . . have consented to the state's jurisdiction"). And the absence of a special election forecloses the possibility that § 1322 applies because the Tribe has not provided the necessary consent.

The district court resisted this straightforward conclusion by accepting Becker's argument that a special election is not always necessary for a tribe to consent to the exercise of state jurisdiction under § 1322(a). Specifically, it found that although a tribe must conduct a special election before it can consent to "permanently authorize the state to assume *global* jurisdiction over [it]," it need not hold a special election before it can "selectively consent"—in a contract like the Agreement, for example—"to a state's exercise of . . . jurisdiction" over a *specific* legal action. App. vol. 15, 3729–30 (emphases added). In other words, according to the district court, a tribe must hold a special election if it "intends to surrender all of its own jurisdiction over tribal matters to a state" but need not do so if it instead intends simply to "waive[] . . . its sovereign immunity over selected matters" in particular litigation. *Id.* at 3727. Based on this view, the district court reasoned that the Tribe's "likelihood of success on the merits" rests not on whether it held a special

16

election authorizing Utah state courts to assume jurisdiction under § 1322 but on "whether there is a valid selective waiver of the Tribe's sovereign immunity in [the Agreement]." *Id.* at 3734. The district court then held that the Agreement validly waives tribal sovereign immunity, thus supplying the Utah state court with jurisdiction over Becker's claims. The district court's analysis is flawed in several significant respects.

First, we agree with the Tribe that the district court's interpretation is inconsistent with the explicit statutory text. Section 1326 makes clear that "[s]tate jurisdiction acquired pursuant to *this subchapter* . . . shall be applicable in Indian country *only where* the enrolled Indians within the affected area . . . accept such jurisdiction" by holding a special election. § 1326 (emphases added). Congress included § 1322 in the same statutory subchapter as § 1326, so jurisdiction acquired under § 1322 can apply in Indian country "only where" the Tribe has held a special election accepting such jurisdiction. *Id.* The use of the limiting term "only" conveys that a special election is a necessary event that must occur before a state court may assert § 1322 jurisdiction. *See* Merriam-Webster's Collegiate Dictionary 867 (11th ed. 2003) (defining adverbial use of "only" as "solely, exclusively"); *Shell Oil Co. v. Manley Oil Corp.*, 124 F.2d 714, 715 (7th Cir. 1941) ("The word 'only' is a limiting and restrictive term . . . and in th[is] sense means 'solely' or the equivalent of the phrase 'and nothing else.'"). Yet the district court's interpretation would allow a state court to assert such jurisdiction despite the nonoccurrence of this necessary event, so long as the tribe has waived sovereign immunity. Because the district court's

17

permissive construction of § 1326's special-election requirement reads "only" out of the statute, we decline to adopt it.[12] *See Dalley*, 896 F.3d at 1215 (noting that courts generally "give effect to all statutory provisions, so that no part will be inoperative or superfluous—each phrase must have distinct meaning" (quoting *Chevron Mining Inc. v. United States*, 863 F.3d 1261, 1283 n.15 (10th Cir. 2017))).

The district court's interpretation also contradicts the Supreme Court's controlling decision in *Kennerly*, 400 U.S. 423. There, the Court held that a Montana state court lacked jurisdiction over a non-Indian's lawsuit against several tribe members to collect a debt incurred on that tribe's reservation. 400 U.S. at 424, 429–30. The tribal government had passed an ordinance granting state courts concurrent jurisdiction over civil cases involving tribe members named as defendants. *Id.* at 425. The Court considered whether this ordinance satisfied the tribal-consent requirement. *Id.* at 428–29. After quoting § 1322 and § 1326 in full, the Court determined that "the meaning of these provisions is clear: [T]he tribal consent that is prerequisite to the assumption of state jurisdiction . . . must be manifested by majority vote of the enrolled Indians within the affected area of Indian country." *Id.* And because the

---

[12] We also reject the district court's suggestion that § 1326 does not apply because it "relates to a *tribe's* ability to independently relinquish to a state the *tribe's* jurisdiction over tribal matters, whether or not the state has accepted the federal government's jurisdiction." App. vol. 15, 3727. Again, this suggestion is contrary to the express language of the statute. The opening words of § 1326 explicitly identify the subject to which it applies—"[s]tate jurisdiction acquired pursuant to this subchapter." Such jurisdiction, the statute says, "shall be applicable in Indian country only where" a special election occurs. § 1326. Thus, § 1326 addresses the circumstances in which *states* may apply the jurisdiction transferred to them by the federal government elsewhere in the subchapter.

tribal ordinance "d[id] not comport with the explicit requirements of the Act" for obtaining tribal consent, the Montana state court lacked jurisdiction. *Id.* at 429.

The district court attempted to distinguish *Kennerly* by highlighting statements in the majority opinion about selective consent, statements the majority offered in response to the dissent.[13] But a close reading of *Kennerly* reveals the flaw in this approach. Justice Stewart's dissent in *Kennerly* suggested that the majority's opinion would "reduce[] the [self-government] options available to [tribes] with respect to state[-]court jurisdiction." *Id.* at 431. The dissent further speculated that "reservation Indians must now choose between exclusive tribal[-]court jurisdiction on the one hand and permanent, irrevocable state jurisdiction on the other." *Id.*

Although the *Kennerly* dissent offered no explanation for this all-or-nothing interpretation, the *Kennerly* majority explained that the dissent had inferred "from the express allowance for selective state exercise of jurisdiction" in § 1322 that Congress somehow intended "to exclude selective tribal consent to state exercise of jurisdiction." *Id.* at 430 n.6. The majority rejected this inference, clarifying that "th[e] case present[ed] no question concerning *the power of the Indian tribes* to place time, geographical, or other conditions on the 'tribal consent' to state exercise of jurisdiction." *Id.* at 429 (emphasis added). Instead, the Court reiterated that it was "presented solely with a question of *the procedures* by which 'tribal consent' must be manifested under the [statute]." *Id.* (emphasis added). In other words, the *Kennerly*

---

[13] The district court did so without input from Becker, who did not discuss, or even mention, *Kennerly* when responding to the Tribe's motion for injunctive relief.

majority left open the possibility that tribes could consent to state-court jurisdiction over some cases and not others.

Nevertheless, the district court here stretched the *Kennerly* majority's suggestion that § 1322 may allow selective tribal consent to mean that § 1326's special-election procedure is only a prerequisite to state-court jurisdiction when a tribe "globally" consents to such jurisdiction. App. vol. 15, 3730. But even if *Kennerly*'s dictum supports a tribe's ability to selectively consent to state-court jurisdiction, its holding explicitly reinforces how this consent must be expressed— through a special election following § 1326's particular procedures. *See Kennerly*, 400 U.S. at 429. And it is undisputed here that the Tribe never held a special election to allow Utah state courts to adjudicate any civil cause of action arising on the reservation, much less Becker's lawsuit against the Tribe.

Next, as the Tribe asserts, the district court conflated tribal sovereign immunity with subject-matter jurisdiction. To support its conclusion that the Tribe's purported waiver of sovereign immunity rendered the special-election requirement inapplicable, the district court quoted Supreme Court caselaw noting that "[a]s a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit *or* the tribe has waived its immunity." App. vol. 15, 3732 (emphasis added) (quoting *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998)). Becker likewise emphasizes this statement on appeal, noting also that the Court cited it favorably three years later in *C & L Enterprises, Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411 (2001).

20

But both *Kiowa* and *C & L Enterprises* concern issues of sovereign immunity. Their statements about when a tribe is "subject to suit" address the circumstances in which a tribe cannot assert sovereign immunity as a defense: when "Congress has authorized the suit or the tribe has waived its immunity." *Kiowa*, 523 U.S. at 754; *see also id.* at 760 ("Congress has not abrogated this immunity, nor has [the tribe] waived it, so the immunity governs this case."); *C & L Enters.*, 532 U.S. at 418 ("To abrogate tribal immunity, Congress must 'unequivocally' express that purpose. Similarly, to relinquish its immunity, a tribe's waiver must be 'clear.'" (citation omitted) (first quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978), and then quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991))). And as we emphasized in *Lawrence*, tribal "sovereign immunity and a court's lack of subject-matter jurisdiction are different animals." 875 F.3d at 545. Waiving sovereign immunity simply renders a party "amenable to suit in a court properly possessing jurisdiction; it does not guarantee a forum." *United States v. Park Place Assocs., Ltd.*, 563 F.3d 907, 923 (9th Cir. 2009). Put differently, "the absence of immunity does not establish the presence of subject[-]matter jurisdiction." *Alvarado v. Table Mountain Rancheria*, 509 F.3d 1008, 1016 (9th Cir. 2007). So, contrary to the district court's view, even if the Agreement waives tribal sovereign immunity, that waiver does not resolve whether the Utah state court has subject-matter jurisdiction over Becker's case. Resolving that issue, we have explained, depends instead on whether the requirements of § 1322 and § 1326 are met. And

21

because here they are not, Congress has not authorized state-court jurisdiction over Becker's lawsuit.[14]

In short, the Tribe's argument that the state court lacks jurisdiction rests on two issues: (1) where Becker's lawsuit arose, and (2) if it arose on the reservation, whether Congress authorized state-court jurisdiction. On the first issue, we hold that Becker's claims arose on the reservation because, based on the district court's factual findings, no substantial part of the conduct supporting those claims took place off the reservation. On the second issue, we hold that Congress has not authorized state-court jurisdiction over Becker's claims because, although § 1322 provides Utah with the means to assume such jurisdiction, the Tribe never consented by holding a

---

[14] This conclusion makes it unnecessary to address the Tribe's argument that the district court also erred by overlooking the so-called "infringement barrier." The Supreme Court has referred to the infringement barrier as one of two "independent but related barriers to the assertion of state regulatory authority over tribal reservations"—the other being federal preemption—either of which "standing alone[] can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members." *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142–43 (1980). Assuming, as the Tribe suggests, the infringement barrier remains a separate basis for concluding that the state court lacks jurisdiction, we have reached that conclusion under the preemption prong. *See Fisher*, 424 U.S. at 386 (explaining that state jurisdiction "depend[s], *absent a governing Act of Congress*, on 'whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them'" (emphasis added) (quoting *Williams*, 358 U.S. at 220)); *Kennerly*, 400 U.S. at 425–26 (rejecting state court's reasoning—that permitting state-court jurisdiction would be "consistent with the exercise of tribal powers of self-government"—because there was "a 'governing Act of Congress'" whose procedures had not been followed); 1 Cohen's Handbook of Federal Indian Law § 7.03(1)(a)(ii) (2019) ("The Court also has held that state jurisdiction is preempted by federal legislation prescribing ways for states to obtain jurisdiction over aspects of Indian country.").

successful special election as required by § 1326.[15] Thus, the state court lacks

subject-matter jurisdiction, and the district court abused its discretion in concluding

that the Tribe was unlikely to succeed on that claim.[16] *Crowe & Dunlevy*, 640 F.3d at

1157.

## II.    Remedy

Next, we must consider the appropriate disposition of this appeal. Our

conclusion that the state court lacks jurisdiction means that, contrary to the district

---

[15] The dissent "agree[s] that § 1322 does not afford the Utah state courts with jurisdiction over Becker's action against the Tribe," Dissent 10, although for a different reason, as we noted earlier, *supra* note 10. From that point of agreement, the dissent turns to what it considers the real "jurisdictional issue" in this case: "whether a Tribe, by way of a written agreement with a non-Indian, may selectively agree to subject itself to state[-]court jurisdiction . . . for disputes arising out of the agreement." Dissent 10. But resolution of that perceived issue necessarily depends on the antecedent question of whether the state court has jurisdiction in the first place, because parties cannot create, by contract, jurisdiction that would not otherwise exist. *Cf. Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."); *U.S. for Use of B & D Mech. Contractors, Inc. v. St. Paul Mercury Ins. Co.*, 70 F.3d 1115, 1117–18 (10th Cir. 1995) (invalidating forum-section clause requiring that claim subject to exclusive federal subject-matter jurisdiction be brought in state court). The dissent does not explain why or how the state court has jurisdiction in the first place. And as we have explained, because Becker's claims against the Tribe arose on the reservation—which the dissent does not dispute—the Utah state court's jurisdiction existed only if authorized by Congress. *See Dalley*, 896 F.3d at 1204. So unless some other federal statute besides § 1322 authorized state-court jurisdiction (a suggestion neither the parties nor the dissent makes), the Agreement could not have, as the dissent posits, allowed the Tribe to "selectively agree to subject itself to state[-]court jurisdiction." Dissent 10. Without approval from Congress, the Utah state courts never had jurisdiction over this particular dispute to begin with.

[16] Because we conclude that the state court lacks jurisdiction, we do not reach the Tribe's alternative argument that both the Agreement and its purported waiver of tribal sovereign immunity are invalid under tribal and federal law.

court's ruling, the Tribe satisfies the first preliminary-injunction element.[17] *See*

*Becker II*, 868 F.3d at 1202. But to obtain a preliminary injunction, the Tribe must

also prove the remaining three elements, which the district court did not consider. *See*

*id.* Under these circumstances, our usual practice is to remand for the district court to

reweigh all four elements anew. *E.g.*, *Kiowa Indian Tribe of Okla. v. Hoover*, 150

F.3d 1163, 1172 (10th Cir. 1998) (reversing district court's analysis on irreparable-

harm factor and "remand[ing] for further consideration of the Tribe's request"

because district court "did not address the other three conditions required for

issuance of a preliminary injunction"). The Tribe asks that we deviate from this

practice and instead order the district court to enter a permanent injunction against

the state-court proceedings. Given the unique circumstances of this appeal, we agree

with the Tribe's proposed resolution.

---

[17] It also means that we cannot, as the dissent proposes, abstain under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Notably, the appellees do not invoke this—or any other—abstention doctrine on appeal: Judge Lawrence raised *Colorado River* early on in the district-court proceedings (even before our decision in *Lawrence*), but neither he nor Becker has mentioned it since. And even if we were to consider the issue sua sponte, as the dissent proposes, this case does not present the "exceptional circumstances" required to abandon our duty to "adjudicate a controversy properly before [us]." *Colorado River*, 424 U.S. at 813 (quoting *Cnty. of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188–89 (1959)). Indeed, *Colorado River* itself recognized that such exceptional circumstances do not exist "if the state court ha[s] no jurisdiction to decide th[e] claims." *Id.* at 809; *see also Arizona v. San Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 560 (1983) ("[A] dismissal or stay of the federal suits would have been improper if there was no jurisdiction in the concurrent state actions to adjudicate the claims at issue in the federal suits."). Because we conclude that the Utah state court lacks jurisdiction, abstention is not an option.

As an initial matter, the requirements for obtaining a permanent injunction are "remarkably similar" to those for obtaining a preliminary injunction. *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 822 (10th Cir. 2007). Indeed, the same four elements apply to both types of injunctive relief, and "[t]he only measurable difference between the two is that a permanent injunction requires showing *actual success* on the merits, whereas a preliminary injunction requires showing a *substantial likelihood of success* on the merits." *Id.* (emphases added).

Moreover, circumstances sometimes arise in which "a decision on the merits underlying the . . . denial of a preliminary injunction" best serves the interests of judicial economy. *Oklahoma ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1113 (10th Cir. 2006); *see also Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 757 (1986) ("That a court of appeals ordinarily will limit its review in a case of this kind to abuse of discretion is a rule of orderly judicial administration, not a limit on judicial power."), *overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). That is, we have discretion, when appropriate, to decide not only that a party "has shown a *likelihood* of success on the merits," but also that "it is altogether clear that [the party] *will* succeed on the merits." *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1272 (11th Cir. 2005).

The circumstances here warrant a judgment on the merits. The Tribe's argument involves a pure legal issue about the applicability of a federal statute, making it a good candidate for a merits decision on appeal from a preliminary-

injunction denial. *See Thornburgh*, 476 U.S. at 757 (approving Third Circuit's decision to resolve underlying merits in preliminary-injunction appeal because "district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance"); *Okla. ex rel. Okla. Tax Comm'n*, 455 F.3d at 1113 (deciding underlying merits in appeal from denial of preliminary injunction because "[t]he issue [wa]s purely legal, the facts [we]re not in dispute, and immediate resolution [would] avoid wasteful future litigation").

We acknowledge that the issue of the state court's jurisdiction involves assessing the district court's findings on where Becker's claims arose. But crucially, because we remanded for supplemental findings on that issue, we have "a full record before [us]" that is "'unusually complete'" for the preliminary-injunction stage. *Thornburgh*, 476 U.S. at 757 (quoting *Am. Coll. of Obstetricians & Gynecologists v. Thornburgh*, 737 F.2d 283 (3d Cir. 1984), *aff'd*, 476 U.S. 747 (1986)). Indeed, the district court held a two-day evidentiary hearing resembling a full-blown trial at which it "heard testimony from fifteen witnesses and received over 140 exhibits." Supp. App. vol. 3, 2. And neither party suggests that any additional evidence remains to be presented, were we to remand for additional proceedings. *Cf. Friarton Ests. Corp. v. City of New York*, 681 F.2d 150, 161 (2d Cir. 1982) (directing dismissal of complaint in addition to reversing grant of preliminary injunction because "[t]he facts critical to a decision . . . are found in the record" and "there is no indication that anything more could be produced at a trial"). Nor do they suggest that any of the

26

remaining injunction requirements involve factual issues requiring a remand.[18] Doing so would only prolong the litigation, while "immediate resolution may avoid wasteful future litigation." *Okla. ex rel. Okla. Tax Comm'n*, 455 F.3d at 1113.

With that in mind, we have no trouble concluding that the Tribe satisfies all four requirements for a permanent injunction.[19] On the first element, we have already explained why the Tribe succeeds on its claim that the Utah state court lacks jurisdiction.[20] And because the Tribe, with its "sovereign status," "should not be compelled 'to expend time and effort on litigation in a court that does not have jurisdiction,'" it satisfies the second requirement of irreparable harm. *Hoover*, 150 F.3d at 1171–72 (quoting *Seneca-Cayuga Tribe of Okla. v. Okla. ex rel. Thompson*, 874 F.2d 709, 716 (10th Cir. 1989)).

---

[18] Indeed, although the Tribe requested a permanent injunction in its opening brief, Becker argued only that the Tribe was unlikely to succeed on the merits and did not address the remaining prongs.

[19] Consideration of the requirements for injunctive relief "ordinarily must be performed by the district court in the first instance." *Citizens United v. Gessler*, 773 F.3d 200, 209 (10th Cir. 2014). Even so, when the district court "fails to analyze the factors necessary to justify a preliminary injunction, this court may do so if the record is sufficiently developed." *Westar Energy, Inc. v. Lake*, 552 F.3d 1215, 1224 (10th Cir. 2009). We see no reason why the same principle should not apply to permanent injunctions given the "remarkabl[e] similar[ity]" between the two standards. *Wagnon*, 476 F.3d at 822.

[20] The dissent disagrees, based on its view that although § 1322 does not apply, the Agreement may independently supply the Utah state court with jurisdiction. We explained earlier why this view is misplaced: The Utah state court needed congressional authorization to assert jurisdiction over Becker's on-reservation claims; no one suggests that any federal statute besides § 1322 authorized such jurisdiction; and the parties could not contractually create state-court jurisdiction that would not otherwise exist. *See supra* note 15.

The Tribe likewise satisfies the third requirement, that the injury to the Tribe "outweighs the harm that the injunction may cause" to Becker. *Wagnon*, 476 F.3d at 822 (quoting *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1180 (10th Cir. 2003)). Though granting the injunction will leave Becker unable to sue the Tribe in state court—"something [he] ha[d] no legal entitlement to do in the first place," given our conclusion that Congress has not authorized jurisdiction—this harm does not outweigh the damage to tribal sovereignty that would result from denying the injunction. *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. Utah*, 790 F.3d 1000, 1005 (10th Cir. 2015); *see also id.* (weighing this factor in favor of granting temporary injunction because doing so would only prevent state defendants from prosecuting tribal members).[21]

Fourth, enjoining the state-court action will not adversely affect the public interest. *See Wagnon*, 476 F.3d at 822. In the district court, Becker argued otherwise based on Utah's alleged interest in adjudicating novel contract disputes between tribes and private parties that are governed by Utah law. But again, Utah had no such interest to begin with: This contract dispute arose on the reservation, and the federal-law prerequisites for state-court jurisdiction are not met. In sum, because the Tribe

---

[21] The Tribe argues that this 2015 case—as well as other related *Ute v. Utah* cases dating back to 1981—provide an independent basis for granting an injunction in this case. Given our holding in the Tribe's favor on other grounds, we need not and do not reach this argument.

has shown all the required elements, it is entitled to a permanent injunction against

Becker's state-court lawsuit.[22]

## Conclusion

The district court erred in denying the Tribe's motion to enjoin Becker's

lawsuit in Utah state court. Becker's claims arose on the reservation because no

substantial part of the conduct supporting them occurred elsewhere, so the state court

could assert jurisdiction only with congressional authorization. Section 1322 does not

supply such authorization because the Tribe never consented to jurisdiction under

that provision by holding a special election as provided in § 1326. For these reasons,

the Tribe succeeds on the merits of its claim that the state court lacks jurisdiction.

And the Tribe also satisfies the remaining elements required for a permanent

injunction. Thus, we reverse the district court's decision to deny the Tribe's motion

---

[22] We recognize that the Anti-Injunction Act (AIA), 28 U.S.C. § 2283, generally bars federal courts from enjoining ongoing state-court proceedings. In *Lawrence*, we flagged this issue as one that could "be addressed by the district court in the first instance." 875 F.3d at 548. We also noted authority suggesting that one of the AIA's exceptions may apply to lawsuits like this one brought by a tribe. *See id.* at 548 n.5; *compare* § 2283 (permitting injunction against state-court proceedings if "expressly authorized by Act of Congress"), *with Sac & Fox Nation v. Hanson*, 47 F.3d 1061, 1063 n.1 (10th Cir. 1995) ("It is possible that [28 U.S.C. § 1362] authorizes federal courts to enter injunctions against state proceedings."). Despite our urging, and even though the Tribe's motion for injunctive relief preemptively argued that one or more AIA exceptions apply here, Becker mentioned the AIA only in passing on remand. On appeal, neither Becker nor Judge Lawrence mention the AIA, let alone argue that it applies. Accordingly, we decline to invoke the AIA as an alternative ground for affirming. *See United States v. Woodard*, 5 F.4th 1148, 1154 (10th Cir. 2021) ("[W]e don't typically 'craft[] arguments for affirmance completely sua sponte and . . . without the benefit of the parties' adversarial exchange.'" (second alteration in original) (quoting *United States v. Chavez*, 976 F.3d 1178, 1203 n.17 (10th Cir. 2020))).

for a preliminary injunction and remand with directions to (1) enter an order permanently enjoining Becker's lawsuit in Utah state court and (2) resolve the Tribe's pending motion for sanctions, assuming it has not been withdrawn.

As a final matter, we deny the Tribe's motion to reassign this case to a different judge on remand. Having carefully examined the record, we conclude that the Tribe has fallen short of establishing the "personal bias" or "extreme circumstances" required under our precedents to grant the "extraordinary" relief of reassignment. *Mitchell v. Maynard*, 80 F.3d 1433, 1448 (10th Cir. 1996).

No. 18-4013, *Ute Indian Tribe of the Uintah and Ouray Reservation, et al. v. Lawrence* **BRISCOE**, Circuit Judge, dissenting.

I dissent. In my view, the majority errs in three respects: by proceeding to address in the first instance the question of whether the Utah state courts have jurisdiction over Becker's pending action against the Tribe; in the manner in which it decides that issue; and by issuing permanent injunctive relief.

Given the history of this litigation, it is my view that we should abstain pursuant to the *Colorado River* doctrine from deciding whether the Utah state courts have jurisdiction over Becker's pending action against the Tribe. *See Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817–821 (1976). It is indisputable that the Utah state courts are capable of determining for themselves whether or not they have jurisdiction over Becker's action against the Tribe. And, in the event that the Utah state courts finally rule against the Tribe on this issue, the Tribe can seek review from the United States Supreme Court. I therefore would remand to the district court with directions to dismiss this case without prejudice.

As for the merits, the majority errs by ignoring the provisions of the parties' written agreement that address how and where disputes should be resolved, and in turn suggesting that 25 U.S.C. § 1322 wholly resolves the jurisdictional issue. And in terms of relief, the majority takes the remarkable, but wholly unwarranted, step of awarding the Tribe permanent injunctive relief.

I

A

It is of course true that in a prior related appeal we held "that whether the state court has jurisdiction to hear . . . Becker's claim" against the Tribe "is a matter of federal law." *Ute Indian Tribe v. Lawrence*, 875 F.3d 539, 543 (10th Cir. 2017) (*Lawrence I*). But we have never held that there is *exclusive* federal jurisdiction over that issue. To the contrary, it is well established that, at least "[u]nder normal circumstances, . . . state courts . . . can and do decide questions of federal law." *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 485 n.7 (1999). It is also well established that such questions include issues of state court jurisdiction over civil disputes involving Indian tribes. *E.g.*, *Upper Skagit Indian Tribe v. Lundgren*, 138 S. Ct. 1649 (2018) (reviewing decision of the Supreme Court of Washington addressing tribal sovereign immunity in a civil in rem dispute).

The Tribe has effectively conceded these points. After Becker filed his action in Utah state district court, the Tribe did not respond by immediately filing this federal action. Instead, the Tribe moved to dismiss Becker's action against it for lack of subject matter jurisdiction. After the state district court denied the Tribe's motion, the Tribe appealed to the Utah Court of Appeals. The Utah Court of Appeals summarily dismissed the Tribe's appeal due to the lack of a final, appealable order. On remand to the state district court, the Tribe continued, unsuccessfully, to obtain a dismissal for lack of subject matter jurisdiction. Only after unsuccessfully litigating the jurisdictional issue in the

2

Utah state courts for approximately a year and a half did the Tribe file this federal action seeking to enjoin Becker's state court action.

In light of this history, I conclude that abstention under the *Colorado River* doctrine is the proper course of action here. More specifically, I conclude, as this court did under similar circumstances in *D.A. Osguthorpe Family Partnership v. ASC Utah, Inc.*, 705 F.3d 1223 (10th Cir. 2013), that "the *Colorado River* doctrine wisely counsels our abstention from duplicative interference with the exceptionally protracted state proceedings present here." 705 F.3d at 1226.

B

The question of whether the district court should abstain from exercising jurisdiction over the Tribe's case has been lurking in this matter since shortly after the Tribe filed its federal complaint. To begin with, Judge Lawrence moved to dismiss the Tribe's federal complaint on the basis of a number of abstention doctrines, including the *Colorado River* doctrine. The Tribe responded to Lawrence's motion, but the district court never ruled on the motion. Subsequently, on January 17, 2018, the district court declined to exercise supplemental jurisdiction over the Tribe's case pursuant to 28 U.S.C. § 1367. The district court also offered three alternative rationales for why it should not reach the merits of the Tribe's claims. In particular, it concluded that "*Younger* abstention should apply here because of the pending state action, the fact that state claim issues predominate[d], and because the Tribe ha[d] a meaningful remedy in the state courts if the state [district] court [wa]s incorrect about its jurisdiction." Aplt. App., Vol.

3

IV at 727–28.  The district court also concluded that, "as a matter of comity," it "should

defer to the state court to decide its own jurisdiction."  *Id.* at 728.  It was the district

court's January 17, 2018 decision that gave rise to the appeal that is now before us.

To be sure, on February 16, 2018, a two-judge panel of this court, acting upon a

motion filed by the Tribe in connection with this appeal, "abate[d] the Tribe's appeal,"

"direct[ed] a limited remand," and instructed the district court on remand "to exercise its

original jurisdiction in accord with the mandate in [*Lawrence I*], and decide the Tribe's

request for injunctive relief against the [Utah] state court proceedings."  Feb. 16, 2018

Order at 2.  But nothing in that order addressed, let alone obviated, the district court's

alternative rationales for declining to exercise jurisdiction.  And for good reason: the two-

judge panel lacked authority to address those alternative rationales on the merits.  As

outlined in 28 U.S.C. §§ 46(b) and (c), appellate courts may hear and decide cases and

controversies by panels consisting of three judges.  Of course, two-judge panels may act

in the absence of an originally designated third judge, but that is not what occurred in this

case.  Rather, the two-judge panel, which had not been assigned to the case as a merits

panel and which lacked a third member, was acting only pursuant to Federal Rule of

Appellate Procedure 27(c), which states, in pertinent part, that "[a] circuit judge may act

alone on any motion, but may not dismiss or otherwise determine an appeal or other

proceeding."

Thus, the district court's January 17, 2018 decision offering the alternative

rationales for abstaining from exercising jurisdiction remains subject to review by this

court.  More specifically, as a result of the two-judge order of this court issued on February 16, 2018, we now have before us in this appeal two related, but alternative rulings from the district court: (1) the district court's original January 17, 2018 decision concluding, in pertinent part, that the Tribe's case should be dismissed under the *Younger* abstention doctrine; and (2) the district court's supplemental decision and order of April 30, 2018, concluding that, even if it exercised jurisdiction over the Tribe's action, the Tribe was unlikely to prevail on the merits thereof and thus was not entitled to a preliminary injunction.

Moreover, even aside from the district court's January 17, 2018 decision, it is beyond dispute that we possess the authority to raise the issue of abstention *sua sponte*. *See Bellotti v. Baird*, 428 U.S. 132, 143 n.10 (1976) (indicating "that abstention may be raised by the court *[s]ua sponte*."); *D.A. Osguthorpe*, 705 F.3d at 1231 ("[A] court may raise the issue of abstention *sua sponte*.").  Thus, I proceed to address the issue of abstention, starting first with the *Younger* doctrine that the district court relied on, and concluding with the *Colorado River* doctrine.

C

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River*, 424 U.S. at 813.  Therefore, "federal courts are obliged to decide cases within the scope of federal jurisdiction," and "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013).

5

The district court in this case concluded that *Younger* abstention was appropriate. Reviewing that conclusion de novo, I disagree. *See D.A. Osguthorpe*, 705 F.3d at 1231 (outlining standard of review). "*Younger* exemplifies one class of cases in which federal-court abstention is required: When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution." *Sprint Commc'ns*, 571 U.S. at 72. The Supreme Court "has extended *Younger* abstention to particular state civil proceedings that are akin to criminal prosecutions, or that implicate a State's interest in enforcing the orders and judgments of its courts." *Id.* at 72–73 (citations omitted). On the record before us, I am not persuaded that Becker's state court proceeding—which involves a civil dispute between private parties over a written contract—falls into any of these narrow categories.

I do, however, agree with Judge Lawrence that abstention is warranted under the *Colorado River* doctrine. In *Colorado River*, the Supreme Court recognized that, in exceptional circumstances, "'reasons of wise judicial administration' must weigh in favor of 'permitting the dismissal of a federal suit due to the presence of a concurrent state proceeding.'" *D.A. Osguthorpe*, 705 F.3d at 1233 (quoting *Colorado River*, 424 U.S. at 818).

The focus of the *Colorado River* doctrine is on "efficiency and economy" and "the avoidance of duplicative litigation." *Id.* The Supreme Court in *Colorado River* "declined to prescribe a hard and fast rule" for application of the doctrine, "but instead described [four] factors relevant to the decision." *Moses H. Cone Mem'l Hosp. v. Mercury Constr.*

6

*Corp.*, 460 U.S. 1, 15 (1983). Those four factors include: "(1) whether the state or federal court first assumed jurisdiction over the same res; (2) 'the inconvenience of the federal forum'; (3) 'the desirability of avoiding piecemeal litigation'; and (4) 'the order in which jurisdiction was obtained by the concurrent forums.'" *D.A. Osguthorpe,* 705 F.3d at 1234 (quoting *Colorado River*, 424 U.S. at 818). The Court has since identified three additional factors that may be relevant: (5) the vexatious or reactive nature of either the federal or the state action; (6) whether federal or state law provides the rule of decision; and (7) the adequacy of the state court action to protect the federal plaintiff's rights. *Moses H. Cone*, 460 U.S. at 17 n.20, 23, 26–27. "The weight to be given any one factor may vary greatly from case to case, depending on the particular setting of the case." *Id.* at 16.

The first two of these factors carry little, if any, weight in the case at hand. To begin with, "this is not an action in rem or quasi in rem" and thus "[n]either the state nor district court has acquired jurisdiction over property in the course of this litigation." *D.A. Osguthorpe*, 705 F.3d at 1234. The second factor—the inconvenience of the federal forum—is essentially irrelevant because "[t]he state and federal courthouses involved in this case are at no great geographical distance from each other, and no party has suggested any physical or logistical inconvenience suffered as a result of litigating in dual forums." *Id.*

All of the remaining factors, however, weigh heavily in favor of dismissing the Tribe's federal action. Becker filed his state court action against the Tribe on December

7

11, 2014. Since that time, the parties have litigated extensively in the state district court, as well as in the Utah appellate courts, and the case is ready for trial. In contrast, the Tribe did not file its federal court action until June 13, 2016, approximately eighteen months after Becker filed his state court action. Moreover, the record makes abundantly clear that the Tribe's filing of its federal lawsuit was reactive in nature, coming only after the Tribe had unsuccessfully attempted in both the state district court and the Utah appellate courts to have Becker's suit dismissed for lack of subject matter jurisdiction. Relatedly, the Tribe's federal lawsuit was never intended to fully litigate the parties' dispute regarding the Agreement, but rather only to stop the state court proceedings. In other words, the claims raised in the Tribe's federal lawsuit would effectively require the district court, and in turn this court, to serve as an appellate tribunal over the state court's decision regarding subject matter jurisdiction. Thus, allowing the Tribe's federal lawsuit to proceed could only result in piecemeal litigation, i.e., the federal courts weighing in on the matter of the state court's jurisdiction over the Tribe, and not a full resolution of the parties' dispute. And, even assuming that the Tribe's defenses to Becker's state court action implicate federal law, it appears that the majority of the parties' dispute—to the extent that dispute is properly before the Utah state courts—will be governed by Utah state law. Indeed, the parties' written Agreement expressly provides that Utah state law will govern any disputes arising out of the agreement. Lastly, any defenses the Tribe may have to Becker's state court action—including defenses that implicate federal law— can, without question, be fully and fairly litigated in the Utah state court system and, if

8

appropriate, the United States Supreme Court. *See Youngblood v. West Virginia*, 547 U.S. 867, 874 (2006) (noting that state courts are "independently authorized to decide issues of federal law"); *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 80 (1988) (noting that the Court can, in its discretion, undertake review of any issues of federal law decided by the state courts).

Having considered all of the relevant factors, I conclude that the Tribe's federal action is indeed the exceptional case warranting *Colorado River* abstention. I therefore vote to remand to the district court with directions to dismiss this action without prejudice.

II

A

The majority ignores the procedural history of this case and Judge Lawrence's abstention arguments, and proceeds to decide the jurisdiction issue in the first instance. In doing so, however, the majority makes what I believe to be three key errors.

First, the majority makes no mention of the fact that the parties' Agreement, which was drafted by the Tribe's attorneys, expressly provided that all disputes arising out of the Agreement would be governed by Utah state law, waived any requirement that disputes be brought in Tribal court, and purported to waive the Tribe's sovereign immunity. Although the Agreement did not expressly mention the Utah state courts, I submit that the only reasonable inference that can be drawn from reading the contractual language is that the parties intended for any disputes to be heard in the Utah state courts

in the event that the United States District Court for the District of Utah lacked jurisdiction over such disputes.[1]

Second, the majority concludes that the Utah state courts lack subject matter jurisdiction over Becker's claims against the Tribe because "25 U.S.C. § 1322 does not provide such authorization." Maj. Op at 3. I agree that § 1322 does not afford the Utah state courts with jurisdiction over Becker's action against the Tribe. But that is because § 1322 addresses only suits involving individual Indians, not Tribes. *See Bryan v. Itasca Cty., Minn.*, 426 U.S. 373, 389 (1976) (noting "there is notably absent" from the statute "any conferral of state jurisdiction over tribes themselves"); 1 Cohen's Handbook of Federal Indian Law § 6.04(3)(b)(v) (2019). In other words, § 1322 simply does not address, nor does the majority, the jurisdictional issue that this case actually poses, i.e., whether a Tribe, by way of a written agreement with a non-Indian, may selectively agree to subject itself to state court jurisdiction and state law for disputes arising out of the agreement.

Finally, the majority takes the remarkable step of granting the Tribe permanent, rather than preliminary, injunctive relief. Of course, the standards for preliminary and permanent injunctions are nearly identical. *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 546 n.12 (1987). But there is one important difference between the

---

[1] Of course, however, the validity of the Agreement remains in dispute and must be resolved in the first instance by the Tribal courts. *See Becker v. Ute Indian Tribe of Uintah and Ouray Reservation*, 11 F.4th 1140, 1150 (10th Cir. 2021).

10

two standards: a plaintiff seeking a preliminary injunction "must show a likelihood of success on the merits" of its claim, while a plaintiff seeking a permanent injunction must establish "actual success" on the merits of its claim. *Id*. According to the majority, this appeal is "a good candidate for a merits decision" because, in part, "[t]he Tribe's argument involves a pure legal issue about the applicability of a federal statute," i.e., 25 U.S.C. § 1322. Maj. Op. at 24. As I have explained, however, § 1322 simply has no relevance to the question of whether the Utah state courts have civil jurisdiction over the Tribe with respect to disputes arising out of the Agreement. Thus, it is apparent, at least to me, that the Tribe has not established actual success on the merits of its claim (or, indeed, a likelihood of success on the merits) and is not entitled to a permanent injunction.

B

The majority responds to my criticisms by noting that I have "not explain[ed] why or how the state court has jurisdiction in the first place." Maj. Op. at 23 n.15. That is because, as I have already outlined, I am of the view that we should abstain from addressing that question and allow the Utah state courts to resolve this question in the first instance.

That said, I will proceed to highlight several related points that I believe are relevant to the ultimate resolution of this jurisdiction question. It is well established that "[a] state court's jurisdiction is general" and thus quite broad. *Nevada v. Hicks*, 533 U.S. 353, 367 (2001). Broad enough, in fact, to encompass actions brought by Tribes and

11

tribal members against non-Indians for disputes arising on Indian land. *E.g.*, *Williams v. Lee*, 358 U.S. 217, 219 (1959) ("suits by Indians against outsiders in state courts have been sanctioned"). That said, we know that Congress has, by way of Public Law 280 (including § 1322), announced a "federal policy governing" and effectively limiting "the assumption by States of civil and criminal jurisdiction over the Indian Nations." *Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 884 (1986) (*Three Affiliated Tribes II*). But if, as the Supreme Court itself has suggested, Public Law 280 does not address "state jurisdiction over tribes," that leaves open the question of whether Indian tribes may, by way of a commercial contract with a non-Indian, voluntarily subject themselves to state jurisdiction and state law. *Bryan*, 426 U.S. at 389; *see Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 467 U.S. 138, 150 (1984) (*Three Affiliated Tribes I*) ("Nothing in the language or legislative history of Pub.L. 280 indicates that it was meant to divest States of pre-existing and otherwise lawfully assumed jurisdiction."). In resolving that open question, it is crucial to recognize "the federal interests in promoting Indian self-governance and autonomy" and ensure that our answer promotes those interests. *Three Affiliated Tribes II*, 476 U.S. at 884. Given the facts presented here, I "fail to see how the exercise of state-court jurisdiction" over Becker's claims against the Tribe "interfere[s] with the right of" the Tribe "to govern [itself] under [its] own laws." *Three Affiliated Tribes I*, 467 U.S. at 148. Indeed, in my view, the majority's holding is directly contrary to the principles of Indian autonomy and self-governance because it prohibits a Tribe from affirmatively choosing,

12

in the context of a commercial contract with a non-Indian, to subject itself to state

jurisdiction and state law for disputes arising out of the contract.